## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## EASTERN DIVISION

| | |
|---|---|
| Jason Fialkoff and Jeff Knipe,<br><br>                Plaintiffs,<br>v.<br><br>VGM Group, Inc.; Compass Group USA, Inc.; and Foodbuy, LLC,<br><br>                Defendants. | CIVIL ACTION FILE NO.  6:19-cv-2041<br><br>**COMPLAINT** |

COME NOW, the Plaintiffs, Jason Fialkoff and Jeff Knipe, and for their Complaint against Defendants, VGM Group, Inc., Compass Group USA, Inc. and Foodbuy, LLC, allege as follows:

### PARTIES, JURISDICTION AND VENUE

1.     Plaintiff Jason Fialkoff ("Fialkoff") is a resident of Florida.

2.     Jeff Knipe ("Knipe") is a resident of Florida.

3.     VGM Group, Inc. ("VGM") is an Iowa corporation with its principal place of business in Waterloo, Iowa.

4.     Compass Group USA, Inc. ("Compass") is a Delaware corporation with its principal place of business in North Carolina.

5.     Foodbuy, LLC is a Delaware limited liability company with its principal place of business in North Carolina, and is a subsidiary of Compass. Foodbuy operates Compass' rebate processing and Group Purchasing Organization lines of business.

6.     There is complete diversity between Plaintiffs and Defendants and the amount in controversy exceeds $75,000. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a).

7.     This action arises from and relates to Independent Contractor Agreements in which Fialkoff, Knipe and VGM irrevocably agreed and consented to submit to this

Court's jurisdiction with respect to any action to enforce any claim, cause of action, or any matter arising from or in any way related to the Independent Contractor Agreements.

8.     Upon information and belief, VGM assigned the Independent Contractor Agreements to Compass on or about January 1, 2019. As VGM's assignee, Compass is obligated to submit to this Court's jurisdiction to the same extent VGM was obligated under the Independent Contractor Agreements.

9.     Upon information and belief, Compass has acted through its subsidiary Foodbuy with respect to matters related to the Independent Contractor Agreements, and Foodbuy is therefore obligated to submit to this Court's jurisdiction per the terms of said contracts.

10.    Venue is proper in this Court Division.

## FACTUAL ALLEGATIONS

### VGM'S CLIENT REWARDS BUSINESS

11.    On or about December 17, 2010, VGM acquired JKI Client Rewards, a Florida-based company that provided rebates and incentive programs to restaurant chains for food and non-food purchases.

12.    JKI Client Rewards became part of VGM Club, a division of VGM, and was renamed VGM Client Rewards.

13.    VGM Client Rewards offered reduced purchasing costs to restaurant chains through agreements with manufacturers to provide discounted pricing and rebates on items purchased from the manufacturers.

14.    VGM Client Rewards also offered product analysis, contract management, purchase data collection and other services to its restaurant chain members.

15.    VGM partnered with Foodbuy for rebate tracking and opportunity analysis.

16.    VGM Client Rewards was authorized by its members to collect and distribute rebates on their behalf and retain a portion of the rebates for program administration.

69189227.4

**FIALKOFF AND KNIPE'S INDEPENDENT CONTRACTOR AGREEMENTS**

17.     Fialkoff and Knipe were independent contractors with JKI Client Rewards prior to VGM's acquisition of the company.

18.     VGM approached Fialkoff and Knipe with a form of Independent Contractor Agreement to retain their services for VGM.

19.     Fialkoff and D. Jay Ellis, on behalf of VGM, executed an Independent Contractor Agreement with an effective date of December 16, 2010.

20.     Also on or about December 16, 2010, Knipe and VGM executed an Independent Contractor Agreement.

21.     Fialkoff and Knipe's Independent Contractor Agreements were virtually identical, containing the same terms and conditions and referring to Fialkoff and Knipe as "Contractor."

22.     Section 1 of the Independent Contractor Agreements set forth the "Responsibilities of Contractor," which included, among other things: (i) solicitation of new customers to participate in the VGM Client Rewards program and attempting to influence their purchasing decisions; (ii) maintaining and enhancing relationships with clients currently participating in the VGM Client Rewards program; (iii) meeting and communicating with assigned clients; and (iv) presenting product conversion opportunities to clients as specified by VGM.

23.     Section 2 of the Independent Contractor Agreements set forth the "Service Fees" payable to Fialkoff and Knipe as Contractors.

24.     Under Section 2(e) of the Independent Contractor Agreements, Service Fees were to be paid as a percentage of "Rebate Revenue" that VGM received in connection with clients for which Fialkoff and Knipe obtained an executed agreement for reward program tracking through Foodbuy.

25.     The term "Rebates" is defined in Section 2(c) of the Independent Contractor Agreements as "sums paid to VGM by Foodbuy, producers, manufacturers or distributors of food/beverage or non-food goods and services, or other sources as

69189227.4

consideration for purchases of such goods and services" by clients for which Fialkoff and Knipe obtained an executed agreement for reward program tracking through Foodbuy.

26.     Under Section 2(d) of the Independent Contractor Agreements, "Rebate Revenue" is defined as "Rebates less sums paid from VGM to" clients for which Fialkoff and Knipe obtained an executed agreement for reward program tracking through Foodbuy.

27.     Fialkoff and Knipe performed the services described in their Independent Contractor Agreements for VGM from approximately December 17, 2010 until VGM Client Rewards was sold to Compass and/or Foodbuy, on or about January 1, 2019.

## VGM FAILED TO PAY SERVICE FEES FOR CERTAIN REBATE REVENUE

28.     VGM paid Fialkoff and Knipe's Service Fees in arrears. Fialkoff and Knipe typically received their Service Fees in the middle of each month for clients' purchasing activity that occurred five months prior. As an example, VGM paid Fialkoff and Knipe Service Fees in mid-May 2019 from the Rebates VGM was paid on their clients' purchases during December 2018.

29.     VGM provided Fialkoff and Knipe with spreadsheets on a monthly basis that reflected how their Service Fees were computed.

30.     Fialkoff and Knipe received information in or about June 2018 that VGM was receiving money for client purchases of items sold under distributors' private labels. These payments are commonly referred to as Distributor Private Label ("DPL").

31.     Fialkoff and Knipe were not previously familiar with DPL, were not aware if VGM had been receiving DPL, and were not aware how VGM treated DPL as part of its rebate program.

32.     Fialkoff began inquiring about DPL to Keith Kilgore, President of VGM Client Rewards, in June 2018.

33.     Mr. Kilgore represented to Fialkoff that VGM began receiving DPL in 2018 and that some clients would begin receiving DPL as part of the VGM Client Rewards program, while others would not.

34.     Upon information and belief, a significant amount of the DPL VGM received was paid by Sysco Corporation ("Sysco") for purchases of its private label products.

35.     VGM referred to Sysco's DPL both as a rebate and as Sysco Marketing Incentive ("SMI"). VGM used the latter term because it claimed Sysco's payments were an incentive to market the company's private label products.

36.     Fialkoff and Knipe prepared an email to Mr. Kilgore, which Fialkoff sent on June 12, 2018. Fialkoff wrote to Mr. Kilgore:

Keith –

Following yesterday's call, I was left feeling uneasy about how we are choosing to handle the funds that were the topic of conversation. I called Jeff [Knipe] for his opinion on how the call went and he too felt the same. Regardless of how the company ultimately decides to handle the revenues generated from SMI, we both felt it important to address these concerns with you. I have copied Jeff who may or may not have something to add but the below outlines our concerns.

I understand we are calling these funds "Sysco Marketing Incentives" and I also understand that the revenues are category-driven rather than item-driven but in the end, no matter what it is that we decide to call them or how it is that the funds are captured, these are revenues that are directly related to purchases made by our clients.

We have always told our clients that the only way we make money is thru a portion of the rebates that they earn. ….

I am not exactly sure when the SMI funds began to be paid out to CR by Foodbuy but that's not important. What I do know is that for as long as they have been coming in they have never been a topic of conversation and until now have never been shared with our clients.

Client Rewards has now made the decision to split a portion of the funds with our clients but how the splits are being handled seems to remain a question. ….

If we look at the way we describe our revenue stream to clients and prospective clients it seems to me that the only two things we should be considering is do we split the SMI funds in the same way that we split the itemized rebates … or if in fact they are not rebate dollars do we give 100% of the SMI revenues to our clients? If we do anything other than that it puts the credibility of Jeff, JD, Wayne,

Ross, Guy, WAG, myself and everyone else out there representing Client Rewards at risk.

In yesterday's conversation we talked about what Club does, what CSM does, what CC does, etc. but at the end of the day the only thing that should matter is what WE do. We have always held ourselves as the clear and transparent option for our clients. I want to be able to continue to hold us in the same light.

It's a very small industry and one where executives bounce around a lot. Our reputation is our strongest asset. Let's be sure to keep that in mind as we navigate through how best to handle this revenue steam now and moving forward.

I hope you are able to see and understand our concerns and look forward to further conversation as we try to nail this out.

37.    Fialkoff tried to obtain detailed information about Sysco DPL payments generated by his clients' purchases through the remainder of 2018, but VGM would not provide that information to him.

38.    Knipe sent an email to Mr. Kilgore on August 20, 2018 regarding questions about paying Sysco DPL to clients. Knipe wrote in his email: "You have the answers, not me. You all have refused to answer my questions as to how long we have been receiving this money. And I still don't know who is getting what %'s and who is getting none of the monies. This is putting our company and me in a bad situation.

39.    On August 30, 2018, Knipe sent another email to Mr. Kilgore with concerns about how VGM was handling Sysco DPL. Knipe wrote: "If we need to talk about each [client] and the reason it's important to pay them, please let me know. Again, I don't know how we determined the payout %'s and why we are paying some accounts and not others."

40.    Mr. Kilgore did not provide any detail on Sysco DPL to Knipe.

41.    Mr. Kilgore informed Fialkoff in September 2018 that he had submitted the issue to "J," which Fialkoff understood to mean James Albritton, Chief Executive Officer of VGM Client Rewards.

42.    On October 24, 2018, Fialkoff asked Jeff Cockerham, Chief Operating Officer of VGM Client Rewards, why Service Fees were not being paid on DPL

revenues. Mr. Cockerham responded that James Albritton "just threw a fit and said WE DO NOT PAY COMMISSIONS ON DPL."

43.     To date, VGM has not paid Fialkoff and Knipe any Service Fees for any DPL revenues paid to VGM for client purchases.

44.     The DPL payments VGM received were Rebates under the terms of the Independent Contractor Agreements because they were sums paid to VGM by Foodbuy, producers, manufacturers or distributors of food/beverage or non-food goods and services, or other sources as consideration for purchases by clients.

45.     Because VGM's DPL payments were Rebates, VGM was required to pay Service Fees to Fialkoff and Knipe for them.

## COMPASS, FOODBUY AND VGM COORDINATE PROPOSALS TO FIALKOFF AND KNIPE TO NEUTRALIZE THE DPL LIABILITIES

46.     Fialkoff and Knipe did not receive advance notice of Compass' and/or Foodbuy's purchase of VGM Client Rewards.

47.     While continuing to provide services under their Independent Contractor Agreements after the January 1, 2019 acquisition, Fialkoff and Knipe discussed the terms of their ongoing Client Rewards relationships with James Albritton, who now had the title of CEO Food Service Channel for Foodbuy, and with Mike Knight, Chief Financial Officer of Foodbuy.

48.     On January 29, 2019, Fialkoff sent an email to Mr. Albritton as follows:

James,

When I first learned about DPL I didn't understand what it is or the amount of revenues that it generates. I now have learned that this is not a program that just began in 2018 and I have also learned that it is a very significant revenue stream. Client Rewards has generated millions in DPL dollars from clients in Region 2 but has chosen not to share any portion with CTB Foodservice Consultants; and until recently has not shared any with the clients from which these revenues are derived. For over 10 years CTB has been a significant factor building Client Rewards to what it has become today. Moving forward, I would like to ensure that DPL is part of the CTB compensation plan. Additionally I request that Client Rewards review DPL revenues generated by Region 2 since its inception and compensate CTB

with back commissions that are owed. I look forward to your feedback on how we can best handle and resolve this matter.

49.     Fialkoff's reference to "CTB" meant CTB Client Rewards, LLC dba CTB Foodservice Consultants, a limited liability company owned by Fialkoff (hereafter, "CTB"). Fialkoff provided services to VGM through his limited liability company and individuals who worked for it.

50.     Fialkoff's reference to "Region 2" represented his client base at VGM Client Rewards.

51.     On March 22, 2019, Mr. Knight sent an email to Fialkoff titled "CTB transaction" and copied Mr. Albritton and Dennis Hogan, who is Chief Executive Officer for Foodbuy.

52.     In this email, Mr. Knight proposed to structure an arrangement with CTB as a consulting arrangement and a non-compete/non-solicitation agreement.

53.     Under the proposal, CTB would be paid $4 million over three years in exchange for the restrictive covenants ($2 million at the beginning of the first year, $1 million at the end of the second year, and $1 million at the end of the third year).

54.     In addition to the $4 million in restrictive covenant payments, the proposal communicated by Mr. Knight provided for payments if Fialkoff obtained firm written agreements with "key accounts" and a declining percentage of revenue for new clients Fialkoff signed up during the first three years of the new contract.

55.     The proposal Mr. Knight communicated also provided for payment of $150,000 per year for three years for consulting services that would include Fialkoff's "efforts to train and transfer account relationships over to Foodbuy or Client Rewards account managers."

56.     Later in March 2019 Fialkoff spoke with Mr. Albritton, who said that Compass and Foodbuy were inclined to cut off negotiations and not work with Fialkoff after reviewing his response to their proposal, but Mr. Albritton assured Fialkoff that he was in full control of getting a deal done.

69189227.4

57.     Mr. Albritton also told Fialkoff that he was negotiating to have VGM pay the $2 million in up-front compensation under the proposed non-compete/non-solicitation agreement, and that VGM would make the payment because VGM could show it as a part of the sale transaction rather than a direct expense.

58.     Mr. Albritton sent Fialkoff a draft Consulting Agreement on April 16, 2019 with signature blocks for Fialkoff and Compass.

59.     Exhibit C to the draft Consulting Agreement provided that VGM would pay Fialkoff $2 million in restrictive covenant fees within 30 days after the Consulting Agreement's effective date, and Compass would pay Fialkoff the remaining $2 million in restrictive covenant fees in subsequent years.

60.     Mr. Albritton separately told Knipe that VGM would directly pay him the initial restrictive covenant fees for his proposed contract with Compass/Foodbuy.

61.     On April 26, 2019, Alexander Stokas, Assistant General Counsel for Compass, sent an email titled "Jason Fialkoff consulting agreement" to Mr. Albritton copying Mr. Hogan, Mr. Knight, and Tracey Downs, the Director of Human Resources at Foodbuy.

62.     Mr. Albritton forwarded this email to Fialkoff.

63.     Mr. Stokas outlined certain changes to Fialkoff's draft Consulting Agreement that were made in a new version attached to his April 26, 2019 email, including Fialkoff's request to clarify that "DPL rebates paid to Foodbuy by distributors will be included as part of the commission calculation for New Clients."

64.     On May 3, 2019, Mr. Stokas sent a copy of the Consulting Agreement to Fialkoff for his review and signature, noting that Compass would return a countersigned copy "pending confirmation from VGM that they are ready to proceed with the payments that they will send to you directly."

65.     Mr. Stokas also sent a Consulting Agreement to Knipe on May 3, 2019.

66.     The Consulting Agreements Mr. Stokas sent to Fialkoff and Knipe (together, the "Consulting Agreements") recite that VGM sold Compass all of its assets

9

related to its Client Rewards division and others (the "Purchased Business") pursuant to an Asset Purchase Agreement (the "Purchase Agreement"), and Compass "acquired all of VGM's rights stemming from any contracts, agreements, arrangements, understandings and privileges with any independent contractors that provided services to the Purchased Business[.]"

67. Upon information and belief, Compass either directly purchased VGM Client Rewards' assets under the Purchase Agreement or caused Foodbuy to do so as the Compass subsidiary operating its rebate processing and Group Purchasing Organization lines of business.

68. Fialkoff and Knipe had not previously been informed that their Independent Contractor Agreements were acquired by Compass or Foodbuy.

69. Fialkoff and Knipe were not given the option to continue providing services under their Independent Contractor Agreements rather than enter into the Consulting Agreements.

70. Upon information and belief, Compass and Foodbuy did not intend to work with Fialkoff or Knipe under the terms of their Independent Contractor Agreements, or any terms other than the Consulting Agreements' terms.

71. The Consulting Agreements recited that they would be effective May 3, 2019 and their purpose was to confirm the parties' agreement related to the services that Fialkoff, Knipe and their respective legal entities (hereafter, the "Consultants") would provide for Compass, the payments that Consultants would receive from Compass and VGM, and the covenants that Consultants would agree to in order to receive such payments and to protect Compass' purchase under the Purchase Agreement.

72. The Consulting Agreements did not provide for any payments to Consultants for the period of time since the Purchase Agreement closed and Compass or Foodbuy became VGM's assignee under the Independent Contractor Agreements.

73. Fialkoff and Knipe understood that their relationship with Compass or Foodbuy, if any, would be as set forth in the Consulting Agreements if they chose to sign.

74.     The immediate payment of restrictive covenant fees was removed from both Consulting Agreements, and no payments from VGM to Fialkoff, Knipe or their legal entities were addressed in the Consulting Agreements.

75.     Instead, Mr. Albritton sent documents titled "Confidential Settlement Agreement and Mutual Release" to Fialkoff and Knipe on May 3, 2019 that conditioned VGM's payment of the amounts Compass and Foodbuy proposed as up-front restrictive covenant fees on Fialkoff and Knipe's release of all compensation claims against VGM, their acknowledgment that VGM assigned their Independent Contractor Agreements to Compass, their agreement to keep the terms of the transaction confidential, and other terms and conditions.

76.     Mr. Albritton sent the Confidential Settlement Agreement and Mutual Releases to Fialkoff and Knipe from his private Gmail account rather than his foodbuy.com email account.

77.     Upon information and belief, Compass and Foodbuy coordinated with VGM to restructure the proposals to Fialkoff and Knipe in order to obtain releases of liability for unpaid DPL commissions on a confidential basis while securing Fialkoff's and Knipe's services as independent contractors, which would discourage them from communicating with Client Rewards members about the non-payment of DPL rebates.

78.     Fialkoff and Knipe shared an understanding that if they signed the settlement agreements, they would be prohibited under the documents' confidentiality terms from speaking with any clients about the fact DPL rebates were not paid to them.

79.     Fialkoff and Knipe did not sign the Consulting Agreements or settlement agreements.

## COMPASS AND FOODBUY BEGAN DEFAMING FIALKOFF AND KNIPE AND INTERFERING IN THEIR BUSINESS RELATIONSHIPS AFTER THEY DECLINED THE CONSULTING AGREEMENTS

80.     On or about May 14, 2019, Fialkoff and Knipe informed Compass and Foodbuy that they declined to sign the Consulting Agreements and had decided to work

11

instead with Consolidated Concepts, Inc., which also serves restaurant chains in group purchasing.

81. On or about May 16, 2019, Jeff Cockerham, Vice President of Foodservice & Distribution for Client Rewards, sent an email using Constant Contact to clients of Fialkoff and Knipe with the subject line: "Double Your Client Rewards Rebates."

82. Upon information and belief, Mr. Cockerham is directly employed by Compass in his position for Foodbuy.

83. Mr. Cockerham's email was personalized for each recipient, listing only that recipient's email address in the "to" line and using the recipient's name in the body.

84. Mr. Cockerham's email announced that Foodbuy acquired VGM Client Rewards earlier in 2019 and had "restructured our business model to benefit our members."

85. Redundantly, Mr. Cockerham's email stated: "Under our new business model, all employees are direct employees of Client Rewards, a division of Foodbuy."

86. Mr. Cockerham's email continued: "Those who previously managed your account were **highly commissioned independent contractors.** We would like to make you a 'Direct Member' of Client Rewards. What does this means [sic] to you? Simply stated, your rebates will double. Because no commissions will be paid to employees we are now able to double your normal rebate checks." (Emphasis in original).

87. Mr. Cockerham's email also announced: "[w]e will also provide a dedicated **Non-Commissioned Account Manager**, to manage your account." (Emphasis in original).

88. Upon information and belief, substantially the same email was sent by Mr. Cockerham or another Compass or Foodbuy employee to each client Fialkoff and Knipe worked with at VGM Client Rewards soon after they declined to sign Compass' commission agreements.

89. Upon information and belief, Compass and/or Foodbuy had engaged other commissioned independent contractors for Client Rewards and continue to use

commissioned independent contractors in their Client Rewards business.

90.     Mr. Cockerham's emails blatantly attempted to poison the relationships between Fialkoff, Knipe, and their clients by falsely portraying Fialkoff and Knipe as having taken in commissions as much as half of the rebate revenues that members of VGM Client Rewards were eligible to receive.

91.     Mr. Cockerham's emails falsely implied that restaurant chains that signed up directly with VGM Client Rewards received greater rebates than restaurant chains that signed up through an independent contractor like Fialkoff and Knipe.

92.     In reality, as Mr. Cockerham, Compass and Foodbuy knew well, VGM Client Rewards members were eligible for the same rebate payments regardless if they worked with an independent contractor or not.

93.     Compass and Foodbuy chose to refer to "highly commissioned independent contractors" in its emails to undermine the relationship between Fialkoff, Knipe and their clients by attacking Fialkoff and Knipe's integrity and trustworthiness.

94.     Compass and Foodbuy were aware that VGM had withheld DPL payments from Client Rewards members and knew that rebate payments would be increasing because Compass and Foodbuy intended to pay DPL rebates to members going forward.

95.     Compass and Foodbuy representatives, including the Chief Operating Officer – Foodservice for Foodbuy, Scott Sanders, followed up on Mr. Cockerham's email by placing calls to Fialkoff and Knipe's client base, making the same and similar false statements about Fialkoff and Knipe's commissions limiting their rebate revenue.

96.     Upon information and belief, Mr. Sanders is directly employed by Compass in his position for Foodbuy.

97.     Fialkoff and Knipe, through counsel, sent Compass demands on May 19, 2019 and May 24, 2019 to cease and desist from defaming them while promoting Client Rewards. Compass refused to comply with the demands.

98.     Compass and Foodbuy communicated to Fialkoff and Knipe's clients that rebates would increase solely due to the elimination of commissioned independent

contractors in hopes that clients would not ask questions that would require Compass or Foodbuy to disclose that DPL payments had been kept by VGM Client Rewards instead of being paid to them.

99.     When they were asked about DPL payments, Mr. Cockerham and Mr. Sanders, during separate phone calls with clients of Fialkoff and Knipe, falsely stated that Fialkoff and Knipe were responsible for setting up their clients' DPL rebates and Client Rewards would need to investigate whether the clients were owed money.

100.    Mr. Cockerham and Mr. Sanders knew when they made these statements that Fialkoff and Knipe had no role in setting rebate rates for VGM Client Rewards members and had no power to change them.

101.    Mr. Cockerham and Mr. Sanders knew when they made these statements that clients had not been paid DPL they were entitled to because VGM Client Rewards chose not to pay the clients.

102.    Compass and Foodbuy became aware of VGM's failure to pay DPL rebates to Client Rewards members before one or the other purchased VGM Client Rewards.

103.    Compass or Foodbuy chose to purchase VGM Client Rewards anyhow and excluded the DPL liabilities from the transaction with the intention that they would remain with VGM.

104.    Rather than proactively correct the withholding of DPL rebates from Client Rewards members by paying members what they were owed, or requiring VGM to pay the members what they were owed, Compass and Foodbuy intended to conceal the issue, including by coordinating with VGM the offer of Settlement Agreements and Consulting Agreements to Fialkoff and Knipe in hopes they would not disclose the non-payment of DPL rebates to Client Rewards members.

105.    Just as the Consulting Agreements stated that their purpose was to protect Compass' purchase of VGM Client Rewards assets under a Purchase Agreement, Compass and Foodbuy have attempted to conceal the non-payment of rebates by VGM Client Rewards to protect their investment.

14

106. Mr. Cockerham and Mr. Sanders lied about Fialkoff and Knipe's role in setting up DPL rebates for their clients in order to insulate Client Rewards from the issue and persuade the clients not to do business with Fialkoff and Knipe.

107. The ultimate goal in misrepresenting Fialkoff and Knipe's involvement with DPL payments was encourage businesses to continue to do business with Client Rewards.

108. Upon information and belief, Compass' and Foodbuy's false statements have damaged relationships between Fialkoff, Knipe, and certain of their clients, and/or have had the effect of causing certain clients to stop doing business with Fialkoff and Knipe.

109. Compass' and Foodbuy's false statements have also damaged, or threaten to damage, Fialkoff and Knipe's relationships with their clients in separate areas of business they do together.

110. Longstanding clients of Fialkoff and Knipe with whom they have had very strong relationships have begun questioning Fialkoff and Knipe as a result of the false and misleading statements made by Compass and Foodbuy, resulting in those clients' decision not to sign with Fialkoff and Knipe's new rebate processing partner.

## COUNT ONE

### (Breach of Contract – VGM)

111. Plaintiffs incorporate the foregoing allegations as though separately set forth here.

112. Under the Independent Contractor Agreements, VGM was required to pay Service Fees to Fialkoff and Knipe on all Rebate Revenue derived from Fialkoff and Knipe's clients.

113. Rebate Revenue included DPL payments VGM received.

114. VGM breached the Independent Contractor Agreements by failing to pay Service Fees to Fialkoff and Knipe for DPL payments VGM received in consideration for Fialkoff and Knipe's client purchases.

15

115. Fialkoff and Knipe have been harmed by VGM's breaches of the Independent Contractor Agreements in an amount to be proven at trial.

## COUNT TWO

### (Fraud – VGM)

116. Plaintiffs incorporate the foregoing allegations as though separately set forth here.

117. VGM communicated false information to Fialkoff and Knipe about Rebate Revenue VGM earned from client purchases, Service Fees payable to Fialkoff and Knipe, and other facts related to their compensation throughout the entire time VGM owned Client Rewards.

118. VGM concealed material facts from Fialkoff and Knipe about the Service Fees they earned under the Independent Contractor Agreements during the entire time VGM owned Client Rewards, including but not limited to VGM's receipt of Rebate Revenue in the form of DPL payments.

119. Fialkoff and Knipe were unaware that the information VGM communicated to them was false and were unaware that VGM was concealing material information from them.

120. VGM intended Fialkoff and Knipe to rely on the accuracy of the information it provided them about their Service Fees, and intended Fialkoff and Knipe to rely on the non-existence of the concealed facts.

121. Fialkoff and Knipe reasonably relied on the accuracy of the information VGM provided them about their Service Fees and the non-existence of the information VGM concealed, including DPL payments, by continuing to provide services to VGM under the Independent Contractor Agreements for eight years.

122. Fialkoff and Knipe were harmed by VGM's fraudulent actions in an amount to be proven at trial.

123. VGM acted with malice and reckless disregard for Fialkoff and Knipe's rights under the Independent Contractor Agreements, and Fialkoff and Knipe are

69189227.4

therefore entitled to an award of punitive damages in an amount to be determined at trial.

## COUNT THREE

### (Violation of Florida Deceptive and Unfair Trade Practices Act –
### Compass and Foodbuy)

124.  Plaintiffs incorporate the foregoing allegations as though separately set forth here.

125.  Compass' and Foodbuy's actions with respect to Fialkoff and Knipe, as alleged herein, constitute unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade and commerce.

126.  Compass' and Foodbuy's wrongful actions were carried out, in large part, by executives and employees located in Florida and were designed to inflict harm on Fialkoff and Knipe as competitors operating business from Florida.

127.  Compass' and Foodbuy's wrongful actions have caused Fialkoff and Knipe to suffer damages.

128.  Pursuant to Florida Statutes § 501.211(1), Fialkoff and Knipe seek a declaratory judgment that Compass and Foodbuy have engaged in deceptive and unfair trade practices by, among other things: (1) attempting to conceal VGM Client Rewards' non-payment of rebates owed to its members through the coordinated offer of Settlement Agreements and Consulting Agreements to Fialkoff and Knipe; (2) attempting to conceal VGM Client Rewards' non-payment of rebates owed to its members and former members by falsely stating and implying to them that Fialkoff and Knipe were responsible for VGM Client Rewards' failure to pay; (3) deceptively advertising Client Rewards' rebate and incentives program to clients of Fialkoff and Knipe; and (4) attempting to injure Fialkoff's and Knipe's reputations and business relationships to Compass' and Foodbuy's competitive advantage through the communication of false and misleading information to Fialkoff's and Knipe's clients.

129.  Fialkoff and Knipe have suffered damages as a result of Compass' and Foodbuy's deceptive and unfair trade practices as alleged herein and are entitled to an

69189227.4

award of their actual damages, attorney's fees and costs pursuant to Florida Statutes § 501.211(2).

## COUNT FOUR

### (Defamation – Compass and Foodbuy)

130.    Plaintiffs incorporate the foregoing allegations as though separately set forth here.

131.    Compass and Foodbuy, through their officers and employees, have made untrue written and verbal statements of fact about Fialkoff and Knipe to their clients.

132.    Compass and Foodbuy knew that the statements they made about Fialkoff and Knipe were false at the time the statements were made.

133.    Alternatively, Compass and Foodbuy acted with reckless disregard as to the truth or falsity of the statements.

134.    Alternatively, Compass and Foodbuy acted negligently in making the false statements about Fialkoff and Knipe.

135.    Compass' and Foodbuy's statements about Fialkoff and Knipe are defamatory per se because considered alone, they tend to subject Fialkoff and Knipe to distrust, contempt, and disgrace, and because they tend to injure Fialkoff and Knipe in their trade and profession.

136.    Alternatively, Compass' and Foodbuy's statements about Fialkoff and Knipe are defamatory because considered in the context in which they were made, they tend to subject Fialkoff and Knipe to distrust, contempt, and disgrace, and because they tend to injure Fialkoff and Knipe in their trade and profession.

137.    Compass' and Foodbuy's false statements about Fialkoff and Knipe caused them to suffer damages in an amount to be proven at trial.

138.    Compass and Foodbuy acted with malice and intent to sow distrust and resentment towards Fialkoff and Knipe among their clients, and Fialkoff and Knipe are therefore entitled to an award of punitive damages in an amount to be determined at trial.

## COUNT FIVE

69189227.4

**(Tortious Interference with Business Relationships – Compass and Foodbuy)**

139.    Plaintiffs incorporate the foregoing allegations as though separately set forth here.

140.    Fialkoff and Knipe have established business relationships with the clients they supplied to VGM Client Rewards, many of whom are also clients of Fialkoff and Knipe in business lines other than foodservice consulting.

141.    Compass and Foodbuy were at all relevant times aware of Fialkoff's and Knipe's relationships with their clients.

142.    As set forth herein, Compass and Foodbuy have intentionally and improperly interfered, without justification, in the business relationship between Fialkoff, Knipe, and their clients.

143.    Fialkoff and Knipe have sustained damages from Compass' and Foodbuy's interference in their business relationships in an amount to be proven at trial.

## COUNT SIX

**(Injunctive Relief – Compass and Foodbuy)**

144.    Plaintiffs incorporate the foregoing allegations as though separately set forth here.

145.    Fialkoff and Knipe have established business relationships in the foodservice consulting industry and in other areas of business with the clients they supplied to Client Rewards.

146.    Compass' and Foodbuy's wrongful acts, including their defamation of Fialkoff and Knipe, have caused clients and business relations of Fialkoff and Knipe to question their ability to handle their purchasing accounts and have made it difficult for Fialkoff and Knipe to enjoy their business relationships in other endeavors.

147.    Fialkoff and Knipe lack an adequate remedy at law to prevent Compass and Foodbuy from continuing to injure their business relationships and correct the harm that has already been done by Compass' and Foodbuy's actions.

148.    Fialkoff and Knipe seek an injunction prohibiting Compass and Foodbuy

from stating or implying that Fialkoff and Knipe were paid from monies that VGM Client Rewards members were entitled to receive as rebates; prohibiting Compass and Foodbuy from singling out the purported elimination of commissioned independent contractors from Client Rewards' business model as a reason Client Rewards offers to increase rebate payouts, unless all factors underlying the decision to make the offer are disclosed; and prohibiting Compass and Foodbuy from stating or implying that Fialkoff or Knipe were either directly or indirectly responsible for VGM Client Rewards' failure to pay DPL to its members.

149. Fialkoff and Knipe also seek an injunction requiring Compass and Foodbuy to correct the false statements their executives and employees have made by contacting each person to whom the false statements were made and confirming, as applicable: that Fialkoff and Knipe were not paid from rebates that VGM Client Rewards members were entitled to receive; that the purported elimination of commissioned independent contractors from Client Rewards' business model is not the sole reason Client Rewards has offered to increase rebate payouts, and disclosing all factors underlying the decision to make such offers; and that neither Fialkoff nor Knipe was directly or indirectly responsible for VGM Client Rewards' failure to pay DPL to its members.

150. Fialkoff and Knipe will suffer irreparable harm absent the entry of injunctive relief as set forth above.

151. The injunctive relief set forth above will serve the public interest.

## COUNT SEVEN

### (Breach of Contract – Compass)

152. Plaintiffs incorporate the foregoing allegations as though separately set forth here.

153. VGM assigned Fialkoff and Knipe's Independent Contractor Agreements to Compass on or about January 1, 2019.

…

154. Fialkoff and Knipe provided services under their Independent Contractor

20

Agreements between January 1, 2019 and May 14, 2019.

155. Fialkoff and Knipe's Service Fees for transactions that occurred in January 2019 were due in the middle of June 2019.

156. Compass has failed to pay Fialkoff and Knipe their Service Fees despite their request for payment.

157. By its actions as described above, Compass has made it clear it will not pay Fialkoff and Knipe what they are owed.

158. Compass terminated the Independent Contractor Agreements by repudiating them and is therefore required to pay Service Fees to Fialkoff and Knipe for a period of one hundred eighty (180) days after the termination.

159. Fialkoff and Knipe have been harmed by Compass' breaches of the Independent Contractor Agreements in an amount to be determined at trial.

## COUNT EIGHT

### (Breach of Contract – Foodbuy)

160. Plaintiffs incorporate the foregoing allegations as though separately set forth here.

161. Plaintiffs assert this claim in the alternative to Count Seven.

162. VGM assigned Fialkoff and Knipe's Independent Contractor Agreements to Foodbuy on or about January 1, 2019.

163. Fialkoff and Knipe provided services under their Independent Contractor Agreements between January 1, 2019 and May 14, 2019.

164. Fialkoff and Knipe's Service Fees for transactions that occurred in January 2019 were due in the middle of June 2019.

165. Foodbuy has failed to pay Fialkoff and Knipe their Service Fees despite their request for payment.

166. By its actions as described above, Foodbuy has made it clear it will not pay Fialkoff and Knipe what they are owed.

167. Foodbuy terminated the Independent Contractor Agreements by repudiating

them and is therefore required to pay Service Fees to Fialkoff and Knipe for a period of one hundred eighty (180) days after the termination.

168.    Fialkoff and Knipe have been harmed by Foodbuy's breaches of the Independent Contractor Agreements in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Jason Fialkoff and Jeff Knipe respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendants VGM Group, Inc., Compass Group USA, Inc. and Foodbuy, LLC as set forth above, that Compass Group USA, Inc. and Foodbuy, LLC be enjoined as set forth above, that Plaintiffs be awarded interest, their costs and attorney's fees, and for such other and further relief as the Court may deem just.

RESPECTFULLY SUBMITTED this 27th day of June, 2019.

By:  /s/ Mark L. Zaiger
MARK L. ZAIGER            AT0008655
SHUTTLEWORTH & INGERSOLL, P.L.C.
115 Third Street SE, P.O. Box 2107
Cedar Rapids, IA 52406-2107
PHONE:  (319) 365-9461
FAX:      (319) 365-8443
EMAIL:  mlz@shuttleworthlaw.com
Contact email:      heather@shuttleworthlaw.com

and

Craig M. Waugh
POLSINELLI PC, AZ # 026524, *pro hac vice forthcoming*
One E. Washington St., Ste. 1200
Phoenix, AZ 85004

*Attorneys for Plaintiffs Jason Fialkoff and Jeff Knipe*