# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF
## IOWA EASTERN DIVISION

| | |
|---|---|
| Jason Fialkoff and Jeff Knipe, | CIVIL ACTION FILE NO. 6:19-cv-02041 |
| Plaintiffs, | |
| v. | **DEFENDANTS COMPASS GROUP USA, INC.'S AND FOODBUY, LLC'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT AND COUNTERCLAIMS** |
| VGM Group, Inc.; Compass Group USA, Inc.; and Foodbuy, LLC, | |
| Defendants. | |

## ANSWER

Defendant Compass Group USA and Foodbuy, LLC (collectively, "Compass," unless otherwise stated), by and through undersigned counsel, hereby respond to the Complaint of Plaintiffs Fialkoff and Knipe as follows:

## PARTIES, JURISDICTION AND VENUE

1.      Admitted, upon information and belief.

2.      Admitted, upon information and belief.

3.      Admitted, upon information and belief.

4.      Admitted.

5.      Compass admits the allegations in the first sentence of Paragraph 5. Compass further admits that Foodbuy operates Compass's Group Purchasing Organization line of business. Unless expressly admitted, Compass denies the remaining allegations in Paragraph 5.

6.      The allegations in Paragraph 6 constitute legal conclusions to which no response is required; to the extent a response to such legal conclusions is required, they are denied.

7.      Compass admits that the independent contractor agreements between VGM and

Mr. Fialkoff dated December 16, 2010 and between VGM and Mr. Knipe dated December 16, 2010 (collectively, the "Independent Contractor Agreements") each provided that its construction and interpretation would be governed by Iowa law. The remaining allegations of Paragraph 7 constitute legal conclusions to which no response is required; to the extent a response to such legal conclusions is required, they are denied.

8.     Compass admits that VGM sold, conveyed, transferred, and assigned all of its rights in the Independent Contractor Agreements to Compass pursuant to the asset purchase agreement by and between Compass and VGM dated December 28, 2018 (the "Purchase Agreement"). The remaining allegations of Paragraph 8 constitute legal conclusions to which no response is required; to the extent a response to such legal conclusions is required, they are denied. Unless expressly admitted, Compass denies the remaining allegations in Paragraph 8.

9.     The allegations of Paragraph 9 constitute legal conclusions to which no response is required; to the extent a response to such legal conclusions is required, they are denied.

10.     The allegations of Paragraph 10 constitute a legal conclusion to which no response is required; to the extent a response to such legal conclusion is required, it is denied.

## FACTUAL ALLEGATIONS

11.     Admitted, upon information and belief.

12.     Admitted, upon information and belief.

13.     Admitted, upon information and belief.

14.     Admitted, upon information and belief.

15.     Admitted.

16.     Admitted, upon information and belief.

17.     Admitted, upon information and belief.

18.     Compass admits, upon information and belief, that VGM retained the services of Mr. Fialkoff and Mr. Knipe through the Independent Contractor Agreements.  Compass lacks sufficient information or knowledge to form a belief as to the remaining allegations in Paragraph 18, and these remaining allegations are therefore denied.

19.     Admitted, upon information and belief.

20.     Admitted, upon information and belief.

21.     Paragraph 21 makes reference to "Independent Contractor Agreements" which are written documents that speak for themselves.  Compass denies any allegations inconsistent with the documents.

22.     Paragraph 22 makes reference to "Independent Contractor Agreements" which are written documents that speak for themselves.  Compass denies any allegations inconsistent with the documents.

23.     Paragraph 23 makes reference to "Independent Contractor Agreements" which are written documents that speak for themselves.  Compass denies any allegations inconsistent with the documents.

24.     Paragraph 24 makes reference to "Independent Contractor Agreements" which are written documents that speak for themselves.  Compass denies any allegations inconsistent with the documents.

25.     Paragraph 25 makes reference to "Independent Contractor Agreements" which are written documents that speak for themselves.  Compass denies any allegations inconsistent with the documents.

26.     Paragraph 26 makes reference to "Independent Contractor Agreements" which are written documents that speak for themselves.  Compass denies any allegations inconsistent with

the documents.

27.     Compass lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 27, and these allegations are therefore denied.

28.     Compass lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 28, and these allegations are therefore denied.

29.     Compass lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 29, and these allegations are therefore denied.

30.     Compass lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 30, and these allegations are therefore denied.

31.     Compass lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 31, and these allegations are therefore denied.

32.     Compass lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 32, and these allegations are therefore denied.

33.     Compass lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 33, and these allegations are therefore denied.

34.     Compass lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 34, and these allegations are therefore denied.

35.     Compass lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 35, and these allegations are therefore denied.

36.     Paragraph 36 makes reference to an email, which speaks for itself.  Compass denies any allegations inconsistent with the email.  Compass lacks sufficient information or knowledge to form a belief as to the remaining allegations in Paragraph 36, and these allegations are therefore denied.

37.     Compass lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 37, and these allegations are therefore denied.

38.     Paragraph 38 makes reference to an email, which speaks for itself.  Compass denies any allegations inconsistent with the email.  Compass lacks sufficient information or knowledge to form a belief as to the remaining allegations in Paragraph 38, and these allegations are therefore denied.

39.     Paragraph 39 makes reference to an email, which speaks for itself.  Compass denies any allegations inconsistent with the email.  Compass lacks sufficient information or knowledge to form a belief as to the remaining allegations in Paragraph 39, and these allegations are therefore denied.

40.     Compass lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 40, and these allegations are therefore denied.

41.     Compass lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 41, and these allegations are therefore denied.

42.     Compass lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 42, and these allegations are therefore denied.

43.     Compass lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 43, and these allegations are therefore denied.

44.     Paragraph 44 refers to "Independent Contractor Agreements" which are written documents that speak for themselves.  Compass denies any allegations inconsistent with the documents.  The remaining allegations in Paragraph 44 constitute legal conclusions to which no response is required; to the extent a response to such legal conclusions is required, they are denied.

45.     The allegations in Paragraph 45 constitute legal conclusions to which no response is required; to the extent a response to such legal conclusions is required, they are denied.

46.     Compass lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 46, and these allegations are therefore denied.

47.     Compass admits that James Albritton and Mike Knight discussed the terms of Plaintiffs' ongoing Client Rewards relationships with Plaintiffs after January 1, 2019.  Compass lacks sufficient information or knowledge to form a belief as to whether Plaintiffs continued to provide services under their Independent Contractor Agreements after January 1, 2019, and therefore that allegation is denied.  Unless expressly admitted, Compass denies the remaining allegations in Paragraph 47.

48.     Paragraph 48 makes reference to an email, which speaks for itself.  Compass denies any allegations inconsistent with the email.

49.     Compass lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 49, and these allegations are therefore denied.

50.     Compass lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 50, and these allegations are therefore denied.

51.     Paragraph 51 makes reference to an email, which speaks for itself.  Compass denies any allegations inconsistent with the email.

52.     The allegations of Paragraph 52 concern the contents of an email, which speaks for itself.  Compass denies any allegations inconsistent with the email.

53.     The allegations of Paragraph 53 concern the contents of an email, which speaks for itself.  Compass denies any allegations inconsistent with the email.

54.     The allegations of Paragraph 54 concern the contents of an email, which speaks

for itself. Compass denies any allegations inconsistent with the email.

55. The allegations of Paragraph 55 concern the contents of an email, which speaks for itself. Compass denies any allegations inconsistent with the email.

56. Compass admits that Mr. Fialkoff spoke with Mr. Albritton in or around March 2019. Unless expressly admitted, Compass denies the remaining allegations in Paragraph 56.

57. Compass admits that Mr. Albritton told Mr. Fialkoff that Compass was negotiating to have VGM pay the $2 million in compensation under the proposed non-compete/non-solicitation agreement up-front for accounting reasons. Unless expressly admitted, Compass denies the remaining allegations in Paragraph 57.

58. Compass admits that on or around April 16, 2019 Mr. Albritton sent Mr. Fialkoff a draft consulting agreement. The remaining allegations of Paragraph 58 concern the contents of that agreement, which is a written document that speaks for itself. Compass denies any allegations inconsistent with the agreement.

59. The allegations of Paragraph 59 concern the contents of a draft consulting agreement, which speaks for itself. Compass denies any allegations inconsistent with the agreement.

60. Denied.

61. The allegations of Paragraph 61 concern the contents of an email, which speaks for itself. Compass denies any allegations inconsistent with the email.

62. Admitted.

63. The allegations of Paragraph 63 concern the contents of an email, which speaks for itself. Compass denies any allegations inconsistent with the email.

64. The allegations of Paragraph 64 concern the contents of an email, which speaks

for itself.  Compass denies any allegations inconsistent with the email.

65.  The allegations of Paragraph 65 concern the contents of an email, which speaks for itself.  Compass denies any allegations inconsistent with the email.

66.  The allegations of Paragraph 66 concern the contents of agreements, which speak for themselves.  Compass denies any allegations inconsistent with the agreements.

67.  Compass admits that it purchased certain VGM Client Rewards' assets from VGM.  Unless expressly admitted, Compass denies the allegations in Paragraph 67.

68.  Compass lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 68, and these allegations are therefore denied.

69.  Denied.

70.  Denied.

71.  The allegations of Paragraph 71 concern the contents of agreements, which speak for themselves.  Compass denies any allegations inconsistent with the agreements.

72.  The allegations of Paragraph 72 concern the contents of agreements, which speak for themselves.  Compass denies any allegations inconsistent with the agreements.

73.  Compass lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 73, and these allegations are therefore denied.

74.  The allegations of Paragraph 74 concern the contents of agreements, which speak for themselves.  Compass denies any allegations inconsistent with the agreements.

75.  The allegations of Paragraph 75 concern the contents documents, which speak for themselves.  Compass denies any allegations inconsistent with the documents.

76.  The allegations of Paragraph 76 concern the contents of an email, which speaks for itself.  Compass denies any allegations inconsistent with the email.

77.     Denied.

78.     Compass lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 78, and these allegations are therefore denied.

79.     Admitted.

80.     Compass admits that, on or around May 2019, Mr. Fialkoff and Mr. Knipe informed Compass that they would not sign the Consulting Agreements and that they were going to work for one of Compass's competitors, Consolidated Concepts, Inc.  Unless expressly admitted, Compass denies the allegations in Paragraph 80.

81.     Compass admits that Jeff Cockerham is Vice President of Foodservice & Distribution for Client Rewards.  Compass denies that any email was sent to "clients of Fialkoff and Knipe."  The remaining allegations in Paragraph 81 refer to an email, which speaks for itself. Compass denies any allegations inconsistent with the email.

82.     Compass admits that as of May 16, 2019, Mr. Cockerham was an employee of Compass.

83.     The allegations of Paragraph 83 concern the contents of an email, which speaks for itself.  Compass denies any allegations inconsistent with the email.

84.     The allegations of Paragraph 84 concern the contents of an email, which speaks for itself.  Compass denies any allegations inconsistent with the email.

85.     The allegations of Paragraph 85 concern the contents of an email, which speaks for itself.  Compass denies any allegations inconsistent with the email.

86.     The allegations of Paragraph 86 concern the contents of an email, which speaks for itself.  Compass denies any allegations inconsistent with the email.

87.     The allegations of Paragraph 87 concern the contents of an email, which speaks

for itself.  Compass denies any allegations inconsistent with the email.

      88.     The allegations of Paragraph 88 concern the contents of emails, which speak for themselves.  Compass denies any allegations inconsistent with the emails.  Except as expressly admitted, the allegations of Paragraph 88 are denied.

      89.     Compass denies that it has engaged other commissioned independent contractors to service any of Client Rewards' customers that were formerly serviced by Mr. Fialkoff or Mr. Knipe since on or around May 16, 2019.  Compass further states that it uses independent contractors in other parts of its Client Rewards' business.  Except as expressly admitted, the allegations of Paragraph 89 are denied.

      90.     Denied.

      91.     Denied.

      92.     Denied.

      93.     Denied.

      94.     Denied.

      95.     Denied.

      96.     Admitted.

      97.     Compass admits that it received letters from counsel for Mr. Fialkoff and Mr. Knipe on May 19, 2019 and May 24, 2019.  As to the contents of the letters, the letters speak for themselves. Compass denies any allegations inconsistent with the letters.  Compass specifically denies that it defamed Mr. Fialkoff or Mr. Knipe.  Except as expressly admitted, the allegations of Paragraph 97 are denied.

      98.     Denied.

      99.     Denied.

100.    Denied.

101.    Denied.

102.    Denied.

103.    Compass admits that it purchased certain VGM Client Rewards' assets from

VGM. Unless expressly admitted, Compass denies the allegations in Paragraph 103.

104.    Denied.

105.    Denied.

106.    Denied.

107.    Denied.

108.    Denied.

109.    Denied.

110.    Denied.

**COUNT ONE**
**(Breach of Contract – VGM)**

111.    Count One is directed at a party other than Compass and therefore no response is
required. Insofar as a response is required, denied.

112.    Count One is directed at a party other than Compass and therefore no response is
required. Insofar as a response is required, denied.

113.    Count One is directed at a party other than Compass and therefore no response is
required. Insofar as a response is required, denied.

114.    Count One is directed at a party other than Compass and therefore no response is
required. Insofar as a response is required, denied.

115.    Count One is directed at a party other than Compass and therefore no response is
required. Insofar as a response is required, denied.

## COUNT TWO
## (Fraud – VGM)

116.     Count Two is directed at a party other than Compass and therefore no response is required.  Insofar as a response is required, denied.

117.     Count Two is directed at a party other than Compass and therefore no response is required.  Insofar as a response is required, denied.

118.     Count Two is directed at a party other than Compass and therefore no response is required.  Insofar as a response is required, denied.

119.     Count Two is directed at a party other than Compass and therefore no response is required.  Insofar as a response is required, denied.

120.     Count Two is directed at a party other than Compass and therefore no response is required.  Insofar as a response is required, denied.

121.     Count Two is directed at a party other than Compass and therefore no response is required.  Insofar as a response is required, denied.

122.     Count Two is directed at a party other than Compass and therefore no response is required.  Insofar as a response is required, denied.

123.     Count Two is directed at a party other than Compass and therefore no response is required.  Insofar as a response is required, denied.

## COUNT THREE
## (Violation of Florida Deceptive and Unfair Trade Practices Act – Compass and Foodbuy)

124.     The Court dismissed Count Three, so no response is required.  Insofar as a response is required, denied.

125.     The Court dismissed Count Three, so no response is required.  Insofar as a response is required, denied.

126.     The Court dismissed Count Three, so no response is required.  Insofar as a response is required, denied.

127.     The Court dismissed Count Three, so no response is required.  Insofar as a response is required, denied.

128.     The Court dismissed Count Three, so no response is required.  Insofar as a response is required, denied.

129.     The Court dismissed Count Three, so no response is required.  Insofar as a response is required, denied.

## COUNT FOUR
### (Defamation – Compass and Foodbuy)

130.     Defendants incorporate all of the foregoing responses as though fully set forth herein.

131.     Denied.

132.     Denied.

133.     Denied.

134.     Denied.

135.     Denied.

136.     Denied.

137.     Denied.

138.     Denied.

## COUNT FIVE
### (Tortious Interference with Business Relationships – Compass and Foodbuy)

139.     Defendants incorporate all of the foregoing responses as though fully set forth herein.

140.     Compass lacks sufficient information or knowledge to form a belief as to the

allegations in Paragraph 140, and these allegations are therefore denied.

141.     Denied.  Compass specifically denies that any of its clients belonged to Mr.

Fialkoff and Mr. Knipe, rather than Compass.

142.     Denied.

143.     Denied.

**COUNT SIX**
**(Injunctive Relief – Compass and Foodbuy)**

144.     The Court dismissed Count Six, so no response is required.  Insofar as a response

is required, denied.

145.     The Court dismissed Count Six, so no response is required.  Insofar as a response

is required, denied.

146.     The Court dismissed Count Six, so no response is required.  Insofar as a response

is required, denied.

147.     The Court dismissed Count Six, so no response is required.  Insofar as a response

is required, denied.

148.     The Court dismissed Count Six, so no response is required.  Insofar as a response

is required, denied.

149.     The Court dismissed Count Six, so no response is required.  Insofar as a response

is required, denied.

150.     The Court dismissed Count Six, so no response is required.  Insofar as a response

is required, denied.

151.     The Court dismissed Count Six, so no response is required.  Insofar as a response

is required, denied.

## COUNT SEVEN
### (Breach of Contract – Compass)

152.     Defendants incorporate all of the foregoing responses as though set forth fully herein.

153.     Compass admits that VGM sold, conveyed, transferred, and assigned all of its rights in the Independent Contractor Agreements to Compass pursuant to the Purchase Agreement dated December 28, 2018.  Except as expressly admitted, the allegations of Paragraph 153 are denied.

154.     Denied.  Compass specifically denies that either of Mr. Fialkoff or Mr. Knipe complied with the terms of their Independent Contractor Agreements.

155.     Denied.  The Independent Contractor Agreements provided that if Mr. Fialkoff or Mr. Knipe terminated their agreements, Mr. Fialkoff and Mr. Knipe were not "entitled to any compensation for revenues received by VGM after date of termination," which termination occurred on May 14, 2019.

156.     Denied.  Compass specifically denies that it owes Mr. Fialkoff or Mr. Knipe any Services Fees.

157.     Denied.

158.     Denied.

159.     Denied.

## COUNT EIGHT
### (Breach of Contract – Foodbuy)

160.     Defendants incorporate all of the foregoing responses as though set forth fully herein.

161.     Paragraph 161 states a legal conclusion to which no response is required.  Insofar

as a response is required, denied.

162. Compass admits that VGM sold, conveyed, transferred, and assigned all of its rights in the Independent Contractor Agreements to Compass pursuant to the Purchase Agreement dated December 28, 2018. Except as expressly admitted, the allegations of Paragraph 162 are denied.

163. Denied. Compass specifically denies that Mr. Fialkoff or Mr. Knipe complied with the terms of their Independent Contractor Agreements.

164. Denied. Compass specifically denies that it owes Mr. Fialkoff or Mr. Knipe any Services Fees.

165. Denied.

166. Denied.

167. Denied.

168. Denied.

## AFFIRMATIVE DEFENSES

For further answer and by way of defense, Compass asserts the following affirmative defenses:

### FIRST DEFENSE

Plaintiffs' claims fail to state a claim upon which relief may be granted.

### SECOND DEFENSE

Plaintiffs have materially breached the Independent Contractor Agreements, thereby excusing Compass's performance.

### THIRD DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of anticipatory repudiation.

**FOURTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have failed to comply with necessary conditions precedent.

**FIFTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, as a result of a failure of consideration.

**SIXTH DEFENSE**

The Independent Contractor Agreements have been substantially and/or partially performed, and as such, are subject to divisibility.

**SEVENTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, by the doctrines of release, accord, and satisfaction.

**EIGHTH DEFENSE**

Plaintiffs have breached the implied covenant of good faith and fair dealing with respect to the Independent Contractor Agreements.

**NINTH DEFENSE**

Plaintiffs' defamation claims are precluded by qualified privilege applicable to Compass' actions.

**TENTH DEFENSE**

Plaintiffs' defamation claims are precluded by the affirmative defense of truth or substantial truth.

**ELEVENTH DEFENSE**

Plaintiffs' defamation claims are precluded by the defense of opinion.

## TWELFTH DEFENSE

Any claim of interference with contract is precluded by privileges applicable to Compass' actions.

## THIRTEENTH DEFENSE

Plaintiffs have failed to mitigate their damages and/or have alleged speculative damages.

## FOURTEENTH DEFENSE

Any of the Plaintiffs' requested relief that is equitable in nature, including requests for injunctive relief, is barred by the doctrines of unclean hands and equitable estoppel.

## FIFTEENTH DEFENSE

Plaintiffs' claims are barred in whole or in part by the economic loss doctrine.

## SIXTEENTH DEFENSE

Compass is entitled to a pro tanto, dollar-for-dollar, credit for monies received by the Plaintiffs from settling parties and non-parties in compensation for the Plaintiff's damages.

## SEVENTEENTH DEFENSE

Plaintiffs were, themselves, at "fault" as defined by Iowa Code § 668.1 and said fault was a cause in fact of the Plaintiffs' injury and damages and the injury and damages were within the scope of liability of the Plaintiffs' fault. Plaintiffs' injuries or damages, if any, may have been caused or contributed to by the acts or omissions of persons, entities or forces over which Compass exercised no authority or control. Wherefore, the fault of the parties should be compared as provided by Iowa Code Chapter 668 and Plaintiffs' recoverable damages should be reduced and/or eliminated as provided by that Chapter.

## EIGHTEENTH DEFENSE

Compass reserves its right to assert all affirmative and other defenses as appropriate,

including those contemplated by the applicable Rules of Civil Procedure, after the benefit of discovery.

## DEFENDANTS' COUNTERCLAIMS TO PLAINTIFFS' FIALKOFF AND KNIPE

As for its counterclaims against Plaintiffs Fialkoff and Knipe, Defendants Compass Group USA, Inc. and Foodbuy, LLC allege as follows:

### PARTIES, JURISDICTION, AND VENUE

1.    Compass Group USA, Inc. ("Compass") is a Delaware corporation with its principal place of business in North Carolina.

2.    Foodbuy, LLC ("Foodbuy") is a limited liability company whose sole members are Compass and Morrison Investment Company, Inc. Morrison Investment Company, Inc. is a Delaware corporation and its principal place of business is in Georgia.

3.    Upon information and belief, Jason Fialkoff ("Mr. Fialkoff") is a resident of Florida.

4.    Upon information and belief, Jeffrey D. Knipe ("Mr. Knipe") is a resident of Florida.

5.    This Court has personal jurisdiction over Mr. Knipe and Mr. Fialkoff.

6.    There is complete diversity between Compass and Foodbuy, on the one hand, and Mr. Knipe and Mr. Fialkoff, on the other hand. The amount in controversy exceeds $75,000. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a).

7.    Venue is proper in this court pursuant to 28 U.S.C. § 1391(b).

### FACTUAL BACKGROUND

8.    Foodbuy is the largest foodservice procurement and supply chain solutions organization in North America. Foodbuy is the sole purchasing partner for its parent company,

19

Compass.  Foodbuy also serves as the purchasing partner for other companies and entities, including restaurants, which Foodbuy calls its "Members."

9.      Foodbuy procures various products and services for Compass and its Members, including food, disposable packaging, cleaning supplies, as well as wireless services, pest control, and uniform rentals.

10.     Foodbuy, which is commonly referred to as a Group Purchasing Organization ("GPO"), realizes savings and efficiencies for Compass and its Members by collecting purchasing volume and using that leverage to negotiate discounts with manufacturers, distributors, and other vendors.

11.     Foodbuy manages more than $20 billion in purchase volume on behalf of Compass and its Members.  Foodbuy also manages over 800 leading manufacturers through over 2,000 contracts, offering programs with industry leaders in food, beverages, supplies, equipment, and services.

### A.      COMPASS PURCHASES CERTAIN VGM ASSETS

12.     VGM is a corporation that, among other things, owned and operated two businesses in or around December 2018:  (a) Streamline Solutions, which provides various group purchasing and other logistics, procurement, and operational services through its operating divisions Client Rewards, Health Services, and Creative Purchasing Solutions (collectively, the "Streamline Business"); and (b) VGM Club, which provides various group purchasing and other logistics, procurement, and operational services to clubs, restaurants, and resorts (the "Club Business").

13.     On or about December 28, 2018, Compass and VGM entered into an Asset Purchase Agreement ("Purchase Agreement") through which Compass purchased substantially all of the assets and properties of VGM relating to, used, or held for use in connection with the

operation of the Streamline Business and Club Business (collectively, the "Purchased Business") (such purchase, the "Acquisition").

14. As set forth in Section 1 of the Agreement, the assets of the Purchased Business acquired by Compass included: (a) fixed assets, such as equipment and furnishings; (b) client contracts; (c) business records; (d) intellectual property; (e) supplier, vendor, and distributor contracts; (f) confidentiality agreements with VGM's employees; and (g) independent contractor agreements.

15. Compass acquired all of VGM's rights to thousands of client contracts pursuant to section 1(b) of the Agreement.

16. With respect to independent contractor agreements, section 1(m) of the Agreement states in part that VGM sells, conveys, transfers, assigns, and delivers to Compass all of VGM's "rights in and to the contracts, agreements, arrangements, understandings, and privileges with any independent contractors that provide services to the Purchased Business . . . ."

17. With respect to confidentiality agreements, section 1(l) of the Agreement states in part that VGM sells, conveys, transfers, assigns, and delivers to Compass all of VGM's rights "under nondisclosure or confidentiality, noncompete, noninducement/recruitment or nonsolicitation agreements with employees, independent contractors or agents of [VGM] or with third parties to the extent relating to the Purchase Business . . . ."

**B. KNIPE AND FIALKOFF BREACH THE NON-COMPETE AND NON-DISCLOSURE AGREEMENTS**

18. From on or about December 16, 2010 to about December 28, 2018, Mr. Knipe and Mr. Fialkoff worked for VGM as independent contractors. Their responsibilities included

soliciting customers and maintaining customer relationships.

19.     On or about December 16, 2010, Mr. Knipe entered into an Independent Contractor Agreement ("Knipe Agreement") with VGM.[1]

20.     On or about December 16, 2010, Mr. Fialkoff entered into an Independent Contractor Agreement ("Fialkoff Agreement," and, collectively with the Knipe Agreement, the "Independent Contractor Agreements") with VGM.[2]

21.     The Independent Contractor Agreements were both for an initial term of one year and automatically renewed for successive one-year periods unless terminated. The Independent Contractor Agreements were both in effect at the time of the Acquisition.

22.     Pursuant to the Purchase Agreement, VGM sold, conveyed, transferred, assigned, and delivered to Compass all of VGM's rights and interests in the Independent Contractor Agreements.

23.     The Independent Contractor Agreements each contain protective covenants that prohibit Mr. Knipe and Mr. Fialkoff from competing with VGM or its successors or assigns during the term of their respective agreements and for a period of one year thereafter.

24.     Each agreement prohibits Mr. Knipe and Mr. Fialkoff from "be[ing] employed by, connected with, participate [sic] in, consult or otherwise associate with any other business, enterprise or venture that is the same as, similar to or competitive with VGM," such as by "soliciting business or sales from" VGM. This non-competition provision inures to the benefit of VGM's "successors and assigns." It lasts during the term of the agreements and for a period of one year thereafter.

---

[1] Compass previously submitted the Knipe Agreement in support of Compass' motion to dismiss Plaintiffs' complaint. *See* Doc. No. 13-2.
[2] Compass previously submitted the Fialkoff Agreement in support of Compass' motion to dismiss Plaintiffs' complaint. *See* Doc. No. 13-1.

25. Each agreement also prohibited Mr. Knipe and Mr. Fialkoff from disclosing "Confidential Information" to anyone, defined to include "confidential, proprietary or trade secret information, whether or not the information is marked or designated as such, that is disclosed to Contractor or that Contractor otherwise learns in the course of engagement . . . ." Paragraph 7(C). This non-disclosure provision inures to the benefit of VGM's "successors and assigns." It lasts during the term of the agreements and for a period of two years thereafter.

26. Mr. Knipe and Mr. Fialkoff agreed that VGM would be entitled to "an injunction restraining any violation" of the non-disclosure and non-compete provisions. They also agreed to pay VGM's reasonable attorneys' fees and costs incurred in seeking to enforce these provisions.

27. Notwithstanding the protective covenants contained in the Independent Contractor Agreements, Mr. Knipe and Mr. Fialkoff have competed with, and disclosed and used the proprietary information of, Client Rewards in direct violation of the Independent Contractor Agreements, as described further below.

**C.      KNIPE AND FIALKOFF DEFAME FOODBUY AND LURE AWAY ITS CUSTOMERS**

28. Foodbuy has thousands of customers in the Client Rewards division that it purchased from VGM, known as "Client Rewards." Client Rewards provides rebates and incentive programs to restaurant chains for food and non-food purchasers. Client Rewards offers reduced purchasing costs to restaurant chains through agreements with manufacturers to provide discounted pricing and rebates on purchased items. Upon information and belief, Mr. Fialkoff and Mr. Knipe provided services to hundreds of Client Rewards' customers.

29. Client Rewards' business model is to pass on a portion of the rebates that it receives from manufacturers or distributors to its customers. Client Rewards keeps a portion of

the received rebates for itself to offset expenses incurred to administer the program.  In certain circumstances Client Rewards may share its portion of the rebates with independent contractors who assist with managing the customers' relationship.

30.    On information and belief, Client Rewards paid a percentage of its portion of the rebates to Mr. Fialkoff and Mr. Knipe prior to the Acquisition.

31.    On or around May 14, 2019, Mr. Knipe and Mr. Fialkoff ended their contractual relationship with Client Rewards.  On information and belief, at that time, if not sooner, Mr. Knipe and Mr. Fialkoff entered into a contractual relationship with a competitor of Client Rewards that also serves restaurant chains in group purchasing.

32.    On information and belief, Mr. Knipe and Mr. Fialkoff immediately began contacting Client Rewards' customers and making false disparaging comments about Client Rewards in an attempt to lure them away from Client Rewards.

33.    On May 15, 2019, Mr. Fialkoff sent an email to one of Client Rewards' customers.  Mr. Fialkoff attempted to lure the customer away from Foodbuy, promising "an increase in rebate earnings of no less than 15%."  The representative then forwarded the email to Foodbuy to ask "Is this legit?  That isn't the regular email I receive."

34.    On May 16, 2019, Mr. Fialkoff sent an email to another one of Client Rewards' customers.  Mr. Fialkoff stated that Client Rewards "ha[s] chosen to withhold those fund [sic] [rebates on distributor private label ("DPL") products] instead of splitting them with the clients that generate them.  There are some clients that I am learning potentially owed over $100,000 in past DPL dollars.  I too am owed a lot of money from these DPL dollar Client Rewards has chosen to withhold."

35.    On May 20, 2019, Mr. Knipe sent an email to another one of Client Rewards'

customers.  Mr. Knipe stated "I need to make a company change due to some serious integrity issues I have with Client Rewards.  I couldn't work there anymore and moved to a new company with a much better program."

36.     On May 21, 2019, a company owned and controlled by Mr. Fialkoff sent a letter to Foodbuy purporting to terminate the contracts of twenty-two customers.  On or around that date, these contracts constituted a significant percentage of the customers that Mr. Fialkoff and Mr. Knipe serviced on Client Rewards' behalf.

37.     On June 3, 2019, Mr. Knipe sent an email to one of Client Rewards' customers, stating "Client Rewards purposely withheld thousands of dollars from [certain entities] for about 7 years, which is why I left the company . . . Unfortunately, as I told [certain persons], they cannot be trusted."

38.     On or around June 3, 2019, Mr. Fialkoff sent an undated email to undisclosed customer recipients stating that "I have parted ways with Client Rewards due to some lingering integrity issues that involve their handling of rebate dollars and proper distribution of funds to my clients."  He said that he had "found a new home with" one of Client Rewards' competitors and that "[s]witching over literally takes less than a minute."  He said that Client Rewards' offer to "double your rebates" "appears to me like a tactic to lock you in with them using an offer that cannot truly be quantified."

39.     On June 19, 2019, Client Rewards reached out to one of its customers.  Client Rewards informed the customer of a letter that it received from a company owned and controlled by Mr. Fialkoff that purported to terminate the customer's relationship with Client Rewards, which the customer denied authorizing.  The customer was "confused" because the customer "ha[d] been contacted by Jason Fialkoff who [the customer] thought was our representative with

your company." The customer affirmed that the customer's company had been a member "for some time and would like to remain that way."

40. On information and belief, Mr. Fialkoff forged a signature on a document purporting to sign on behalf of one of Client Rewards' customers.

41. On information and belief, Mr. Knipe and Mr. Fialkoff have made and continue to make disparaging verbal and written statements to Client Rewards' customers.

42. As independent contractors of Client Rewards, Mr. Knipe and Mr. Fialkoff obtained Client Rewards' confidential, proprietary, and trade secret information, including rebate split, revenue, and price program information for customers whose accounts Mr. Knipe and Mr. Fialkoff serviced on behalf of Client Rewards.

43. Compass purchased Client Rewards' confidential, proprietary, and trade secret information from VGM pursuant to the Purchase Agreement. As such, this information has considerable economic value to Compass and Client Rewards.

44. Client Rewards does not disclose its aggregate rebate split, revenue, and price program information, which is not generally known or readily ascertainable. Moreover, Client Rewards takes reasonable precautions to protect this confidential, proprietary, and trade secret information.

45. On information and belief, Mr. Knipe and Mr. Fialkoff have used and disclosed, and continue to use and disclose, Client Rewards' confidential, proprietary, and trade secret information to benefit third parties, including Client Rewards' competitors.

46. On information and belief, Mr. Knipe and Mr. Fialkoff have used and continue to use Client Rewards' confidential, proprietary, and trade secret pricing information in an effort to undercut Client Rewards' pricing and rebate splits and steal its customers.

## COUNT 1 – DEFAMATION PER SE & PER
## QUOD/BUSINESS DEFAMATION
### (Fialkoff and Knipe)

47.     Compass restates and realleges the foregoing allegations as if fully set forth herein.

48.     Compass asserts that Mr. Fialkoff and Mr. Knipe's behavior was libelous per se because Mr. Fialkoff and Mr. Knipe intentionally wrote false and misleading statements about Compass and used defamatory language against Compass in their emails and other communications with its customers, including those dated May 16, 2019, May 20, 2019, June 3, 2019, and the undated email sent on or around June 3, 2019.

49.     These emails referred to Client Rewards by name, were made of and concerning Compass, and were so understood by those who read the emails.

50.     The statement contained in the email from Mr. Knipe dated May 16, 2019 that Client Rewards "ha[s] chosen to withhold those fund [sic] [rebates on DPL products] instead of splitting them with the clients that generate them," that some clients are "potentially owed over $100,000 in past DPL dollars," and that Mr. Fialkoff too is "owed a lot of money from these DPL dollar Client Rewards has chosen to withhold" are false.

51.     The statement contained in the email from Mr. Knipe dated May 20, 2019 that Mr. Knipe left Client Rewards because it has "serious integrity issues" is false.

52.     The statement contained in the email from Mr. Knipe dated June 3, 2019 that "Client Rewards purposely withheld thousands of dollars from [certain entities] for about 7 years" is false.

53.     The statement contained in the email from Mr. Fialkoff dated June 3, 2019 that Mr. Fialkoff left Client Rewards "due to some lingering integrity issues" is false.

54.     The statement contained in the undated email from Mr. Fialkoff sent on or around June 3, 2019 that Client Rewards' offer to "double your rebates" "appears to [Mr. Fialkoff] like a tactic to lock you in with them using an offer that cannot truly be quantified" is false.

55.     On information and belief, Mr. Fialkoff and Mr. Knipe have made, and continue to make, untrue verbal and written statements regarding Client Rewards to its business associates and contacts including its clients, potential clients, and sales representatives.

56.     Mr. Knipe and Mr. Fialkoff's statements, including the emails described above, impeach Client Rewards in its trade or profession.

57.     Mr. Knipe and Mr. Fialkoff's statements, including these emails, are defamatory on their face within the four concerns thereof.

58.     Mr. Knipe and Mr. Fialkoff's statements, including these emails, have disgraced and degraded Client Rewards.

59.     At the time of the publication of the statements, Mr. Knipe and Mr. Fialkoff knew the statements contained therein were false, acted in reckless disregard of their truth or falsity, or failed to exercise ordinary care in order to determine whether the statements were false.

60.     Additionally, Mr. Knipe and Mr. Fialkoff's actions were undertaken with actual malice that will be proven at trial by evidence of ill will and personal hostility on the part of Mr. Knipe and Mr. Fialkoff.

61.     As a direct and proximate result of Mr. Knipe and Mr. Fialkoff's defamatory statements, as described above, Client Rewards has suffered damages in an amount to be proven at trial.

62.     Given the willful and wanton nature of Mr. Knipe and Mr. Fialkoff's conduct, an award of punitive damages is appropriate.

## COUNT 2 – INJURIOUS FALSEHOOD
## (TRADE LIBEL/PRODUCT DISPARAGEMENT)
### (Fialkoff and Knipe)

63.    Compass restates and realleges the foregoing allegations as if fully set forth herein.

64.    Mr. Knipe and Mr. Fialkoff published, without privilege to do so, disparaging and false statements about Foodbuy's business interests and the manner in which it conducts its business.

65.    Mr. Knipe and Mr. Fialkoff's false disparaging statements, include but are not limited to the statements in their emails with Client Rewards' customers dated May 16, 2019, May 20, 2019, June 3, 2019, and the undated email sent on or around June 3, 2019.

66.    Mr. Knipe and Mr. Fialkoff knew and intended that the false statements would influence persons intending to use Client Rewards' services to refrain from using them.

67.    The false and disparaging statements have played a material and substantial role in: (1) inducing persons not to utilize Client Rewards' services; (2) causing a decline in Client Rewards' business; (3) causing Client Rewards to spend significant amounts of time to address the false statements; and (4) damaging Client Rewards' business reputation.

68.    As a direct and proximate result of Knipe and Mr. Fialkoff's false and disparaging statements, Client Rewards has suffered compensatory and special damages in an amount to be proven at trial.

## COUNT 3 – VIOLATION OF NORTH
## CAROLINA'S UNFAIR AND DECEPTIVE
## TRADE PRACTICES ACT, N.C.G.S. § 75-1.1
### (Fialkoff and Knipe)

69.    Compass restates and realleges the foregoing allegations as if fully set forth herein.

70.     Mr. Knipe and Mr. Fialkoff engaged in unfair and deceptive methods of competition affecting commerce by unfairly inducing, or attempting to induce, customers to terminate their contracts or reduce their business with Client Rewards by communicating false and malicious statements about Client Rewards.

71.     Mr. Knipe and Mr. Fialkoff falsely represented to Client Rewards' customers that the company had "serious" and "lingering" "integrity issues" and that it had "chosen to withhold those [rebate] funds" and "purposely withheld thousands of dollars" from customers.

72.     Customers reported to Client Rewards that they were "confused" and concerned about whether they were receiving "legit[imate]" emails and that they "thought [the communications were from] our representative with your company [Client Rewards]."

73.     As a direct proximate result of Mr. Knipe and Mr. Fialkoff's unfair and deceptive methods of competition, Client Rewards has suffered actual damages in an amount in excess of $75,000, the exact amount of such damages to be proven at trial.

74.     Mr. Knipe and Mr. Fialkoff's unfair and deceptive conduct affected commerce in North Carolina by, among other things, injuring Client Rewards in North Carolina.

75.     Pursuant to N.C. Gen. Stat. § 75-16, Client Rewards is entitled to recover treble damages for Mr. Knipe and Mr. Fialkoff's unfair and deceptive trade practices.

76.     Pursuant to N.C. Gen. Stat. § 75-16.1, Client Rewards is entitled to recover its costs and reasonable attorneys' fees.

### COUNT 4 – TORTIOUS INTERFERENCE<br>WITH CONTRACTS<br>(Fialkoff and Knipe)

77.     Compass restates and realleges the foregoing allegations as if fully set forth herein.

78.     Compass has a contractual and business relationship with each of its customers.

79.     Mr. Knipe and Mr. Fialkoff intentionally and without justification interfered with Client Rewards' relationship with its clients with the purpose and effect of inducing them to terminate their contracts with Client Rewards.

80.     Mr. Knipe and Mr. Fialkoff had full knowledge of Client Rewards' contractual and business relationships with its customers.

81.     These actions caused customers to reduce or terminate their contractual relationships with Client Rewards or disrupted them by making performance more burdensome and expensive.

82.     As a result of Mr. Knipe and Mr. Fialkoff's intentional and tortious interference with Client Rewards' contractual and business relations, Client Rewards has sustained and will continue to sustain injury and damages in its business relationships with its customers and prospective customers.

## COUNT 5 – BREACH OF CONTRACT
### (Fialkoff and Knipe)

83.     Compass restates and realleges the foregoing allegations as if fully set forth herein.

84.     On or about December 16, 2010, Mr. Knipe and Mr. Fialkoff entered into the Independent Contractor Agreements with VGM.  As described above, each agreement contains a non-compete and non-disclosure provision.

85.     On or around December 28, 2018, VGM sold, conveyed, transferred, assigned, and delivered to Compass all of VGM's rights in Mr. Knipe's and Mr. Fialkoff's Independent Contractor Agreements.  Compass, therefore, is an assignee of the non-competition and non-disclosure agreement with VGM.

86.     On or around May 14, 2019, Mr. Knipe and Mr. Fialkoff terminated their contracts with Client Rewards.

87.     On information and belief, Mr. Knipe and Mr. Fialkoff immediately began competing with Foodbuy in the same line of business and soliciting Client Rewards' customers for one of its competitors.

88.     Mr. Knipe and Mr. Fialkoff's solicitations, include but are not limited to the statements in their emails with Foodbuy's customers dated May 15, 2019, May 16, 2019, May 20, 2019, May 21, 2019, June 3, 2019, and the undated email sent on or around June 3, 2019.

89.     On information and belief, Mr. Fialkoff and Mr. Knipe also used and disclosed Client Rewards' confidential, proprietary, and trade secret information, including rebate split, revenue, and price program information, in violation of the non-disclosure provision, in an effort to undercut Client Rewards' pricing and steal Client Rewards' customers.

90.     As a result of Mr. Knipe and Mr. Fialkoff's competition with Client Rewards in violation of the non-competition and non-disclosure agreements, Client Rewards has sustained and will continue to sustain injury and damages in its business relationships with its customers and prospective customers.

91.     As a direct proximate result of Mr. Knipe and Mr. Fialkoff's competition, Client Rewards has suffered damages in an amount to be proven at trial.

### COUNT 6 - VIOLATION OF NORTH CAROLINA'S
### TRADE SECRETS PROTECTION ACT, N.C. Gen. Stat. § 66-153
### (Fialkoff and Knipe)

92.     Compass restates and realleges the foregoing allegations as if fully set forth herein.

93.     As independent contractors of Client Rewards, Mr. Knipe and Mr. Fialkoff obtained confidential business and technical information, including customer lists and rebate split and price program information relating to customers whose accounts Mr. Knipe and Mr. Fialkoff managed.

94.     Mr. Knipe and Mr. Fialkoff knew or should have known of Client Rewards' trade secrets.

95.     The above described information derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use.  Furthermore, Client Rewards does not disclose this information to those outside of Client Rewards.  Accordingly, such information constitutes trade secrets pursuant to N.C. Gen. Stat. §66-152(3).

96.     Upon information and belief, Mr. Knipe and Mr. Fialkoff have made unauthorized disclosures of said trade secrets, and have made unauthorized use of said trade secrets for the purpose of undercutting Client Rewards' rebate splits with its customers in an effort to steal customers away from Client Rewards.

97.     Mr. Knipe and Mr. Fialkoff have committed misappropriation of trade secrets in violation of N.C. Gen. Stat. § 66-152 *et seq*.  The misappropriation of Client Rewards' trade secrets by Mr. Knipe and Mr. Fialkoff was not by mistake, but rather was willful and malicious and made in bad faith.  Consequently, Client Rewards is entitled to injunctive relief, actual and punitive damages, and attorney's fees as a result of the conduct of Mr. Knipe and Mr. Fialkoff.

WHEREFORE, Compass and Foodbuy pray as follows:

1.     That judgment be entered in favor of Compass and Foodbuy and against Mr.

Knipe and Mr. Fialkoff;

2.    That Compass and Foodbuy have and recover damages, including actual, treble, and punitive damages, attorney's fees, interest, and costs;

3.    That an injunction be entered enjoining and restraining Plaintiffs during the pendency of this action and thereafter permanently from soliciting Client Rewards' customers or using Client Rewards' confidential, proprietary, and trade secret information in violation of the Independent Contractor Agreements and North Carolina's Trade Secrets Protection Act;

4.    Trial by jury; and

5.    Such additional relief as they may be entitled to under the facts and applicable law.

This is the 25th day of October, 2019.

ELDERKIN & PIRNIE, P.L.C.

By: */s/ Thomas B. Read*
THOMAS B. READ AT0006394
316 2nd St. S.E., Ste. 124
PO Box 1968
Cedar Rapids, IA 52401
(Tele) 319-362-2137
(Fax) 319-362-1640
Email: read@elderkinpirnie.com

McGUIREWOODS LLP
William C. Mayberry (admitted pro hac vice)
Andrew Atkins (admitted pro hac vice)
Jacob Franchek (admitted pro hac vice)
201 N. Tryon Street, Suite 3000
Charlotte, NC 28202
(Tele) 704-343-2000
(Fax) 704-343-2300
Email: bmayberry@mcguirewoods.com
        aatkins@mcguirewoods.com
        jfranchek@mcguirewoods.com

*Attorneys for Defendants Compass Group USA, Inc. and Foodbuy, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 25, 2019, I filed the foregoing document electronically through the CM/ECF system, which will send notice to Plaintiffs and all counsel of record.

This the 25th day of October, 2019.

*/s/ Thomas Read*
Thomas B. Read